***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence, or to rehear the parties or their representatives, the Full Commission affirms, with substantial modifications of the findings of fact, the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over this matter. *Page 2 
2. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
4. An employee-employer relationship existed between the plaintiff and the defendant-employer on May 22, 2002, the date of the subject injury by accident.
5. While working as an x-ray technician, the plaintiff sustained an injury by accident to her back, which arose out of and in the course of her employment with the defendant-employer on May 22, 2002.
6. On the date of the subject injury, Selective Insurance Company was the workers' compensation carrier for the defendant-employer.
7. The plaintiff's pre-injury average weekly wage and compensation rate as an x-ray technician are $832.21 and $554.81, respectively, based on an hourly wage of $21.08.
8. As a result of the subject injury by accident, the plaintiff was unable to return to her job as an x-ray technician with the defendant-employer, due to the physical demands of that job.
9. On December 3, 2002, Dr. David Peterson, the plaintiff's treating physician, provided her with the restrictions of no lifting greater than 20 pounds, and of working eight (8) hours per day.
10. On December 16, 2002, the plaintiff returned to work for the defendant-employer as a coding and reimbursement specialist. The plaintiff established her earning capacity of $670.39 per week with the coding specialist position, which required her to lift up to 10 pounds and work eight (8) hours per day, five (5) days per week. The position of coding specialist was *Page 3 
not modified in order to accommodate the plaintiff's physical restrictions, and it was an actual job which was available in a competitive market. The plaintiff had an hourly wage of $16.65 in this job.
11. On April 10, 2003, the defendant-employer terminated the plaintiff from her position as a coding specialist for reasons unrelated to her injury.
12. On August 7, 2003, the plaintiff located employment with Pathology Associates as an insurance coordinator. The insurance coordinator position is a sedentary desk job, which was within the plaintiff's physical limitations at that time. The plaintiff had an average weekly wage of no more than $452.03 in this job, based on an hourly wage of $14.25.
13. On September 11, 2003, the plaintiff presented to her physiatrist, Dr. Kern Carlton, M.D., for chronic pain management. On December 11, 2003, Dr. Carlton opined that the plaintiff was at maximum medical improvement, from a pain management standpoint. After she was placed at maximum medical improvement, the plaintiff continued to present to Dr. Carlton on a regular basis for pain management.
14. On January 14, 2004, the plaintiff's neurosurgeon, Dr. Hunter Dyer, opined that the plaintiff was at maximum medical improvement, and assessed her with a 10 percent permanent partial impairment to her back.
15. Pursuant to the Opinion and Award of Deputy Commissioner Phillip A. Holmes entered January 27, 2005, the defendants paid the plaintiff temporary partial disability compensation no greater than $107.88 each week, from April 10, 2003 until the plaintiff was written completely out of work by Dr. Kern Carlton on November 10, 2005. The amount of temporary partial disability compensation was based on the plaintiff's earnings as a coding specialist with the defendant-employer, as described in Stipulation 10, above. *Page 4 
16. The defendants have paid, and continue to pay, temporary total disability compensation to the plaintiff from November 10, 2005 through the present.
17. On May 16, 2006, Dr. Carlton released the plaintiff to return to work for two (2) hours per day, five (5) days per week, with the work restrictions of: alternate sitting and standing as needed; no repetitive lifting, twisting, bending; and no lifting over 10 pounds.
 *********** EXHIBITS
The following exhibits were admitted into evidence:
1. Stipulated Exhibit 1: Pre-Trial Agreement;
2. Stipulated Exhibit 2: Industrial Commission Forms, Opinion and Award, filed January 27, 2005, Plaintiff's Interrogatory Responses, Surveillance Reports, Correspondence from Pathology Associates, Job Description of Insurance Coordinator Position at Pathology Associates, Plaintiff's Medical Records, and Records from Armstrong Associates;
3. Stipulated Exhibit 3: Six (6) Surveillance DVD's;
4. Stipulated Exhibit 4: Transcript of the July 20, 2004 Hearing before Deputy Commissioner Phillip A. Holmes; and
5. Stipulated Exhibit 5: Transcript of Deposition of T. Kern Carlton, M.D., taken on August 11, 2004, pursuant to the prior hearing before Deputy Commissioner Holmes.
 *********** ISSUE
Whether the plaintiff unjustifiably refused suitable employment when she declined a job offer from Pathology Associates, after being released to return to work under restrictions by Dr. *Page 5 
Carlton on May 16, 2006, thus entitling the defendants to suspend her ongoing total disability compensation?
 ***********
Based upon the competent evidence of record, as well as the reasonable inferences therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, the plaintiff was 45 years old. The plaintiff has a two (2) year certificate as an x-ray technician. She worked as an x-ray technician for 22 years at various medical providers, including the defendant-employer. While employed by the defendant-employer, the plaintiff worked more than a full-time schedule, and she often worked overtime. She earned an average weekly wage of $832.21, based on an hourly wage of $21.08, in this job.
2. On May 22, 2002, the plaintiff suffered an admittedly compensable injury to her back while lifting a paraplegic patient onto an x-ray table. Dr. Hunter Dyer, a neurosurgeon, treated the plaintiff after the injury. The plaintiff was medically unable to return to her job as an x-ray technician for the defendant-employer, and for a short time, she was out of work completely until she could find another job. Even though the defendants did not provide vocational rehabilitation services for her, the plaintiff found another job on her own with the defendant-employer as a coding and reimbursement specialist on a part-time basis, beginning August 1, 2002. This was a desk job within her work restrictions of lifting no more than 20 pounds and working no more than eight (8) hours a day. The plaintiff testified that she "had to actually apply for [the job]. And I begged, I guess would be a good word," in order to get hired. Although one normally has to be certified as a coding specialist before taking this particular job, *Page 6 
the defendant-employer was willing to train the plaintiff, and then allow her get certified at a later time. The job evolved into full-time work on December 16, 2002.
3. The plaintiff's earnings at the coding job were $670.39 per week, based on an hourly wage of $16.65, representing 79% of the plaintiff's pre-injury average weekly wage of $21.08 per hour as an x-ray technician. The defendants did not pay temporary partial disability to the plaintiff after her return to work. This prompted the first hearing in this case, which took place on July 20, 2004 before Deputy Commissioner Phillip A. Holmes. Pursuant to the Opinion and Award of January 27, 2005, Deputy Commissioner Holmes determined that the plaintiff had a wage earning capacity of $670.00 per week, and, thus, ordered the defendants to pay the plaintiff partial disability compensation at no greater than $107.88 each week, from April 10, 2003 until the expiration of 300 weeks from the date of injury.
4. On April 10, 2003, the defendant-employer terminated the plaintiff from her job as a coding and reimbursement specialist when several doctors left the defendant-employer and started their own practice. The plaintiff received unemployment compensation during this period. The plaintiff looked for "hundreds" of other jobs while on unemployment. The defendants did not provide a vocational rehabilitation specialist to help her with this job search, even though she was partially disabled and receiving compensation for partial disability. The plaintiff obtained a new job in July 2003.
5. On August 7, 2003, the plaintiff started a new job at Pathology Associates as an insurance coordinator. While working a full-time schedule, the plaintiff earned an average of $452.03 per week in the insurance coordinator job, based on an hourly wage of $14.25. This was 54.3% of the plaintiff's pre-injury average weekly wage with the defendant-employer as an x-ray technician. The defendant-employer was only ordered, however, to pay partial disability at the *Page 7 
rate of $107.88, because the plaintiff's wage earning capacity was established to be $670.39 per week. The plaintiff's job as an insurance coordinator, where she worked from August 2003 until she was written out of work by Dr. Kern Carlton on November 10, 2005, is the subject of this claim.
6. The defendants reinstated the plaintiff's temporary total disability compensation pursuant to a Form 62 dated November 29, 2005, after the plaintiff became medically unable to work. The plaintiff is currently out of work and receiving ongoing temporary total disability compensation.
7. Although the insurance coordinator job was a desk job, it had different physical demands than the plaintiff's previous jobs. The plaintiff testified:
 As an insurance coordinator, if I would sit at my desk and get a phone call and one of the clients would require some information, [and] I'd have to get up and go to a file cabinet or in — the part I had most trouble with was old EOBs [which] were in a box on the floor. . . .[EOBs were] explanation of benefits [forms], but they were in paper boxes, and they were on a floor, so there was a lot more bending and squatting.
8. The plaintiff also had to walk more in this job than in her previous jobs, and she asked male employees or others in the office to help her with the lifting. The plaintiff testified that she still had problems with:
 [s]itting for long periods of time, walking, bending, twisting, like I said before, the boxes on the floor, I mean, they weren't elevated, you know, [like on] file cabinets. It never fails, Murphy's Law. I always had to get in the bottom one and not the top one. If I got comfortable in my chair, and the phone rang, and I had to get up, you know, my leg goes to sleep, so it takes me a while. People don't want to be put on hold for twenty minutes, you know, while I run to the file cabinet — walk to the file cabinet.
9. Kim Bradley was the plaintiff's supervisor at Pathology Associates. Ms. Bradley confirmed that the plaintiff had to bend, squat, and stoop in her job "such as to a filing cabinet, a *Page 8 
four-drawer cabinet, squat to the lower drawer, that type thing," and that the plaintiff had to alternate periods of sitting and standing. Prior to being taken out of work by Dr. Carlton, Pathology Associates made accommodations both for the plaintiff's prosthetic arm and for the physical limitations related to her injury. Ms. Bradley testified that these accommodations included a pull-out tray under her desk for her keyboard, a small step stool to prop her feet on under the desk, and other employees helped her by lifting the heavier boxes.
10. Dr. Kern Carlton, a physical medicine physician, has been providing the plaintiff with chronic pain management since September 11, 2003. Dr. Carlton's treatment of the plaintiff has mostly involved the management of the plaintiff's pain through prescription medications and non-surgical alternatives. However, the plaintiff "cannot take pain medication." Dr. Carlton explained that "[i]n general, she tolerates [medications] poorly." Even at half the normal dosages, some medications have caused severe side effects, such as Lortab, Zoloft, Ultram, Talwin, Vivactil, Paxil, Tramadol, Naloxone (pentazocine), Ambien, Lexapro, Darvocet-N, Oxycodone, Duragesic patches, Methadone, and other narcotics. The side effects include lethargy, drowsiness, vomiting, migraine headaches, sweats, toxicity, and "kaleidoscope vision." Other medications that did not cause any problems did not have any therapeutic effect on the plaintiff. These medications included Vioxx, Celebrex, Elavil, Lidoderm patches, Amitryptyline, Cymbalta, Proptryptyline, Zanaflex (or Tizanidine), and Lyrica. The plaintiff also took Remeron and Baclofen, but could not remember why they were discontinued.
11. The plaintiff's medical records and medical case management reports document the problems she has had with the numerous medications she has been unable to take. Even with work restrictions and her intolerance for medications, the plaintiff continued to work after her *Page 9 
injury. Before November 10, 2005, Dr. Carlton restricted her from lifting more than 10 pounds, but he allowed the plaintiff to work up to eight (8) hours a day.
12. On November 10, 2005, Dr. Carlton took the plaintiff completely out of work because of worsening back pain and radicular leg pain. Dr. Carlton testified that the location and the character of the plaintiff's pain was the same, but the level was higher. The plaintiff had, in the past, reported pain levels at mostly nine (9) out of 10, but had continued to work. According to Dr. Carlton, this was the first time that the plaintiff really felt that she was unable to work. He testified, "[T]he reason I did [take her out of work] . . . on this day was probably that she had — — in the past, had always worked despite her chronic pain, and I was concerned about her mental status as well as her physical status at this point." Dr. Carlton ordinarily does not take his patients completely out of work. The plaintiff testified that "[p]hysically, I could not do it anymore." The plaintiff's condition was getting worse, and she was struggling in her day-to-day activities, including getting ready for work, as well as in doing her job.
13. Dr. Carlton continued prescribing medications for the plaintiff, even though she continued to have problems tolerating them, and he referred her back to Dr. Dyer to see if anything surgically could be done. When Dr. Dyer did not find a surgical lesion, he referred the plaintiff to Dr. John Welshofer, M.D., who practices medicine with Dr. Dyer at Carolina Neurosurgery and Spine in Charlotte, North Carolina.
14. On January 6, 2006, Dr. Welshofer administered an epidural steroid injection to the plaintiff's lower back. The injection made the plaintiff worse. Dr. Welshofer recommended that the plaintiff participate in aquatic therapy, which provided some relief while she was in the water, but the pain returned after she exited the pool. *Page 10 
15. On December 19, 2005, Dr. Welshofer suggested implantation of a spinal cord stimulator, and referred the plaintiff to Dr. Joshua Miller at Southeast Pain Care for a consultation. Dr. Carlton made a similar referral to Dr. Miller, earlier, regarding a spinal cord stimulator. The plaintiff was reluctant to agree to this recommendation, and after doing her own research, decided not to undergo this procedure. The Full Commission finds that the plaintiff's concerns about the spinal cord stimulator were reasonable, under the circumstances. The plaintiff testified:
 I asked him [Dr. Welshofer] to give me a couple [of] days to decide if that was something I wanted to pursue, because I had checked into it over the Internet and couldn't find anything positive about them. And it's an invasive procedure. And when I went back to Dr. Carlton, he mentioned it, and my rehabilitation nurse and I discussed it, and we decided that maybe it — you know, I'll look into that. . . .[At Southeast Pain, Dr. Miller] gave me a videotape, [and] explained what it was all about. My hesitation about it was when I told them I had a prosthesis, because it's electrical signals. I wanted to know if that would interfere with my prosthesis. And they could not answer that question, and they could not guarantee me that it would [not] have any effect.
16. On March 20, 2006, Dr. Carlton recommended a four (4) week functional restoration program, which the plaintiff could not tolerate, and so he excused her from further attendance after two (2) days. On May 16, 2006, Dr. Carlton released the plaintiff to try to return to work for two (2) hours a day, five (5) days a week, with work restrictions to include: no repetitive lifting, twisting or bending; no lifting of more than 10 pounds; and having the ability to alternate sitting and standing as needed. He did not intend for the restrictions to be permanent, but he does not recall whether he conveyed this to the plaintiff. He indicated on the Workers' Compensation Medical Status Questionnaire that the plaintiff would be under these restrictions indefinitely. Dr. Carlton was of the opinion that the plaintiff was capable of doing some type of work, and testified that he wanted to get the plaintiff in the habit of going to work again. He was *Page 11 
aware that it took the plaintiff several hours to get ready to leave home, due to her pain and physical limitations. The plaintiff consistently reported to Dr. Carlton pain levels in the range of nine (9) on a scale of one (1) to 10, with 10 being the highest level of pain. Dr. Carlton did not believe that the plaintiff was being dishonest about rating her pain level.
17. After getting Dr. Carlton's restrictions regarding working no more than two (2) hours per day, five (5) days per week, on May 16, 2006, the plaintiff contacted Kim Bradley at Pathology Associates, and was advised that she could return to work in her prior job as an insurance coordinator under the restrictions imposed by Dr. Carlton. However, the plaintiff did not return to work for Pathology Associates.
18. On October 9, 2006, the defendants filed a Form 33, contending that the plaintiff refused to return to suitable employment on or about May 22, 2006. The plaintiff contends that this job was not suitable employment, and that she was not physically able to do the job, due to her pain and resulting physical limitations from her compensable injury.
19. The plaintiff testified that she was reluctant to go back on such a reduced schedule for several reasons:
 Physically, it was very difficult, and I was afraid. When I took the coding job, which I got through my own, I was released from coding, because my doctors had left the practice, and so everybody that dealt with those doctors was laid off. And I was afraid if I went back to work at Pathology Associates and I couldn't do more than two hours or if I could just do two hours, that they would terminate me anyway, and I would be out of a job again . . .[b]ecause I physically have reached the end of my rope. I'm not — I'm not scared of trying anything, doing anything. If there was a treatment out there, I would — I would do it. I worked years in pain. I have fought with the doctors to let me work. And it's just to a point now where I cannot tolerate it anymore. And I worry — I worry that — when I look back four years ago, and I could brush my teeth without any problem, and then recently it's becoming a problem, now I worry what it's going to be like in a year, two years. I'm not old and . . .I'm scared. Physically, I was *Page 12 
scared because of everything I've been through, including the work conditioning program that Dr. Carlton had. I couldn't even do that for two days. I cannot make a doctor's appointment one day and make a dentist's appointment the next day. That's just too much physically for me. . .
20. The plaintiff further explained the problems she faces on a daily basis due to her current condition as follows:
 . . .[I]t's — just to get ready and go and — just today, coming here and sitting, standing, walking, I can almost guarantee you I will not be good for a week. I cannot take anything for pain. Everything makes me sick. They cannot do surgery. Nobody can help me. And I just — I'm frustrated. I do not make doctor appointments, because I know it's a hassle. And I don't care if the doctor lives right next door. I still feel like I have to shower, get dressed, get ready and go. That's a two-hour ordeal just to do that much. And then God knows how long you sit in the doctor's office, the drive over there, I don't do it for that reason.
21. Ultimately, the plaintiff testified that she did not think that she could go back to work, even on the significantly reduced schedule of two (2) hours a day, five (5) days a week, issued by Dr. Carlton on May 16, 2006. The Full Commission finds the plaintiff's testimony concerning her pain level and her resulting physical limitations to be both credible and persuasive. The Full Commission further finds that the plaintiff remains unable to go back to work in any capacity at all, including the very limited parameters set forth by Dr. Carlton on May 16, 2006.
22. Were the plaintiff to accept her previous position at Pathology Associates with the new work restrictions placed upon her by Dr. Carlton on May 16, 2006 of working two (2) hours per day, five (5) days a week, at an hourly wage of $14.25, the plaintiff would only earn $142.50 per week. This represents only 17.1 percent of her pre-injury average weekly wage of $832.21 as a radiology technician at the defendant-employer. Pathology Associates did not have any part-time employees out of the 25 people that worked in the office with the plaintiff. *Page 13 
Further, it appears, based upon the evidence, that Pathology Associates actually needed the plaintiff to work full-time, and did not appear to be aware that the plaintiff's limited-duty restrictions were indefinite for the foreseeable future, until the plaintiff was able to work under less stringent restrictions, if ever. The new restrictions, which Dr. Carlton set forth in more detail on the Medical Status Questionnaire, directed the plaintiff to avoid bending, stooping, twisting, kneeling, and squatting. These were activities the plaintiff performed on a regular basis under her prior restrictions before removal from work on November 10, 2005.
23. The Full Commission finds, based on the greater weight of the evidence, that the position made available to the plaintiff at Pathology Associates working two (2) hours per day, five (5) days per week, under the restrictions imposed by Dr. Carlton, did not constitute suitable employment, because the position would have to be so modified that it would not be available in the competitive job market. Further, the job was also not amenable to the plaintiff's functional working capacity, considering the plaintiff's credible evidence concerning her physical limitations due to the level of her pain resulting from her compensable injury. The Full Commission also gives great weight to the expert opinion of Ms. Beverly Carlton, M.R.C., C.D.M.S., C.C.M., Q.R.P., a vocational rehabilitation specialist, that the job offered to the plaintiff under the May 16, 2006 restrictions was neither suitable employment nor substantial gainful employment under nationally recognized standards.
24. The defendants now assert on appeal to the Full Commission that the plaintiff's benefits should be suspended because she refused rehabilitative employment, and that a pre-maximum medical improvement job does not have to be suitable. Based upon the greater weight of the evidence of record, the Full Commission finds, as set forth in the stipulations herein, as well as the other evidence of record, that the plaintiff reached maximum medical improvement *Page 14 
prior to her release to return to work under the restrictions imposed by Dr. Carlton on May 16, 2006. The parties stipulated, "On January 14, 2004, [the] plaintiff's neurosurgeon, Dr. Hunter Dyer, opined that [the] plaintiff was at maximum medical improvement and assessed her with a 10% permanent partial impairment to her back." The defendants did not address the issue of maximum medical improvement in the most recent deposition of Dr. Carlton. The references to maximum medical improvement in this record appear in the September 26, 2006 and November 2, 2006 medical notes of Dr. Carlton, but he does not clarify when the plaintiff reached maximum medical improvement. The January 16, 2007 medical note of Dr. Carlton noted, "She has previously been rated and released."
25. Based upon the greater weight of the evidence, the Full Commission finds that the plaintiff was justified in her refusal to return to work with Pathology Associates for the reasons set forth, above.
 ***********
The foregoing findings of fact engender the following:
 CONCLUSIONS OF LAW
1. It is undisputed that the plaintiff is unable to return to her job as an x-ray technician with the defendant-employer, as a direct result of the compensable injury she suffered on May 22, 2002, given the physical demands of that particular job. See, Stipulation eight (8), above. Although the plaintiff was eventually able to return to work in a less physically demanding position, subject to several work restrictions, in December 2002, it is further undisputed that the plaintiff had a change in her medical condition, and became completely unable to work again in November 2005 due to chronic, poorly controlled pain that became more severe. See, Stipulation 15, above. *Page 15 
2. Based upon the greater weight of the evidence, the Full Commission concludes that the plaintiff remains as unable now as she was in November 2005 to return to any other type of employment, and this complete disability is caused by the plaintiff's compensable, work-related injury. Hilliard v. Apex Cabinet Co., 305 N.C. 593,290 S.E.2d 682 (1982). The testimony of both the plaintiff and of Dr. Carlton supports the conclusion that the physical limitations caused by the plaintiff's compensable injury preclude her ability to work at all. Whereas previously, the plaintiff was able to muster the energy and ability, despite routine pain ratings in the nine (9) out of ten ranges, as well as suffering from various side effects produced by the many medications her injury forced her to take, to go to work, subject to the restrictions imposed by her physicians, she is now completely unable to hold down even the modest job parameters set forth by Dr. Carlton of what amounts to a 10 hour work week.
3. Dr. Carlton testified that he initially took the plaintiff completely out of work in November 2005 for a number of significant reasons, including: her intolerance to almost any pain medication that could provide functional relief to the plaintiff's chronic pain; her consistently increased level of pain; her increased lower extremity weakness; her deteriorating gait; and his concern about the effects of the chronic pain on her stress level and overall mental state. Furthermore, in March 2006, Dr. Carlton excused the plaintiff from participation in a four (4) week functional restoration program, after she demonstrated a physical inability to participate in it after only two (2) days.
4. Ultimately, the plaintiff testified that "physically, I could not do it [work] any more," and "I physically have reached the end of my rope," due to the fact that her pain level now makes it much more difficult for her to even get ready to go to work, or anywhere else. The plaintiff testified that her condition has progressively changed for the worse, inasmuch as it takes *Page 16 
a lot more time and energy to do simple things like bathe and get dressed, and that she now cannot even brush her teeth without assistance. According to the plaintiff, it takes so much time and physical energy to simply get ready and leave her house, and then to recuperate from all of the additional energy expended, that she is hesitant to go to scheduled appointments with her physicians, out of concern for the toll it will take on her body, afterward.
5. In Russell v. Lowes Production Distribution, the North Carolina Court of Appeals held that the burden of proving inability to earn pre-injury wages in the same or other employment was on the workers' compensation claimant, and that this burden could be met in one (1) of four (4) ways, including, proof that the claimant "is capable of some work, but that he has, after a reasonable effort on his part, been unsuccessful in his effort to obtain employment," or by proving that although the claimant is capable of some work, "it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment." Russell v. Lowes ProductionDistribution, 108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993) (citing authorities.)
6. In this case, even Dr. Carlton, who wrote the May 16, 2006 work restrictions at issue, was equivocal about the plaintiff's ability to go back to work in any capacity, when he testified in his deposition that he merely told the plaintiff that "she should try working 2 hours a day with sedentary work restrictions and the ability to alternate sitting and standing as needed." Dr. Carlton further testified that, although he did not remember the specific conversation, he likely told the plaintiff that he wanted her "to try this and see how it goes." Assuming,arguendo, that the plaintiff is "capable of some work," the Full Commission concludes that she has, nonetheless, made more than a reasonable effort at trying to work, but is and will remain *Page 17 
unsuccessful in obtaining employment, due to the nature of the restrictions imposed by Dr. Carlton. Id.
7. The Full Commission concludes that the plaintiff has gone above and beyond what is required of her to make a reasonable effort to go back to work. The testimony in this case quite persuasively illustrates the plaintiff's willingness to work, despite her pain and suffering, and under circumstances many others would refuse to endure. Specifically, as a result of the plaintiff's work-related injury, she testified that she is in constant pain, that she can tolerate little, if any, medication to help lessen the pain, and that the severity of her pain is routinely rated as nine (9) out of 10, and now even progressing to levels of 10. It is not uncommon for people to be taken out of work by their treating physician for pain levels far below these ratings. The plaintiff, however, testified that she "fought with the doctors to let me work," despite the pain and discomfort she had to undergo in order to continue to work in any capacity. What is more, the plaintiff took it upon herself to find work, without the aid of the defendants through vocational rehabilitation or any other means of assistance.
8. Given the plaintiff's frail physical condition, as well as the extremely limited number of positions reasonably available in the workforce that meet Dr. Carlton's stringent temporal and activity restrictions, the Full Commission finds that any effort on the part of the plaintiff to search for and/or begin to work would be futile.Peoples v. Cone Mills, 316 N.C. 426, 342 S.E.2d 798 (1986); Russell v.Lowes Production Distribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993). When "an employee's effort to obtain employment would be futile because of age, inexperience, lack of education or other preexisting factors, the employee should not be precluded from compensation for failing to engage in the meaningless exercise of seeking a job which does not exist." Peoples, 316 N.C. 426, 444, 342 S.E.2d 798, 809 (1986). The plaintiff is *Page 18 
so frail and the May 16, 2006 job restrictions are so difficult for employers to accommodate, that the plaintiff would have an exceedingly difficult time either finding such a job or avoiding termination, either due to her further physical decompensation and/or injury, or due to the potential employer's inability to reasonably accommodate such a modified job position, based upon the business needs of the employer. "An employer facing a business decline reasonably could determine that continued retention of the employee [under such restrictive job modifications] was not feasible." Id., 316 N.C. 426, 438,342 S.E.2d 798, 806 (1986).
9. Peoples further states that if the claimant's co-workers assist the claimant in holding down the job "by doing much of his work for him, or if he manages only by delegating his more onerous tasks to a helper," then such position is not reflective of the claimant's "actual earning capacity, . . . for purposes of determining permanent disability."Id., 316 N.C. 426, 437, 342 S.E.2d 798, 806 (1986). Even before the plaintiff was taken out of work in November 2005, the evidence indicates that she was not able to perform the insurance coordinator position at Pathology Associates without getting other employees to lift "the heavier boxes," given the testimony of the plaintiff's supervisor, Ms. Kim Bradley, although lifting such boxes, as well as bending, squatting, and stooping, all of which were requirements of this particular position, are expressly forbidden under Dr. Carlton's latest job restrictions.
10. As further grounds supporting the futility of any attempt on the part of the plaintiff to re-enter the workforce, the Full Commission concludes that the plaintiff does not actually have a job, but rather, a tentative job offer with Pathology Associates, at best. At worst, Pathology Associates could well decide to either renege on their offer to have the plaintiff come back to her previous position, or to terminate her, due to their need for more permanent, reliable help.Peoples is instructive on this point, as well, stating: *Page 19 
 . . . [W]hen a person has been offered but has not accepted employment after an accident, . . .[this] proffered employment does not accurately reflect the person's ability to compete with others for wages . . . [and] would not accurately reflect earning capacity if other employers would not hire the employee with the employee's limitations . . . [because the] proffered employment is so modified because of the employee's limitation that it is not ordinarily available in the competitive job market. Id., 316 N.C. 426, 438, 342 S.E.2d 798, 806 (1986).
11. The Full Commission further concludes that the "proffered employment" with Pathology Associates constitutes "made work," as that term is used in Peoples. Id. Like the "proffered position" at issue inPeoples, in this case, "`[t]here's not a job like this for an individual on the market.' It is `engineered and designed for an individual.'"Id. The fact that Pathology Associates did not have any part-time employees out of the 25 people that worked there, that Pathology Associates actually needed the plaintiff to work full-time, and given that Pathology Associates did not appear to be aware that the plaintiff's limited-duty restrictions may turn out to be indefinite, if the plaintiff's physical condition did not improve, all point to the conclusion that if the plaintiff went back to her previous position at only two (2) hours a day, five (5) days a week, without being able to bend, stoop, twist, kneel, or squat, (all of which the plaintiff performed on a regular basis under her prior restrictions before being written completely out of work in November 2005), then such position would be nothing more than "made work."
12. With respect to the defendants' contention that the job the plaintiff refused constituted rehabilitative employment, and that the plaintiff's refusal of pre-maximum medical improvement rehabilitative employment justifies suspension of compensation, the Full Commission concludes that the evidence establishes that the plaintiff reached maximum medical improvement prior to the May 16, 2006 tentative offer of the job at issue, herein, and that the plaintiff established that she was incapable, due to her injury, of performing even the modified *Page 20 
"made work" job. The Full Commission concludes that the plaintiff was justified in refusing the part-time, modified job at Pathology Associates working two (2) hours a day, five (5) days a week, earning only 17.1 percent of her pre-injury average weekly wage, because the job did not constitute suitable employment. The job was so modified that it is not readily available in the competitive marketplace. Id. Also, the job did not fit within the Commission's definition of suitable employment. I.C. Rehab. Rule III. G.
 ***********
Based upon the foregoing Stipulations, Findings of Fact, and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fee approved, below, the defendants shall continue to pay ongoing temporary total disability compensation to the plaintiff at the rate of $554.81 per week until further order of the Commission.
2. Defendants shall continue to pay all medical expenses incurred or to be incurred by the plaintiff as a result of the compensable injury, according to the procedure allowed by the Commission.
3. A reasonable attorney's fee in the amount of 25% is hereby approved for the plaintiff's counsel. This fee shall be deducted from the sums due the plaintiff and paid directly to the plaintiff's counsel by deducting every fourth compensation check due the plaintiff.
4. The defendants shall pay the costs due the Commission.
 This the ___ day of May 2008. *Page 21 
S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/___________________ DANNY L. McDONALD COMMISSIONER
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1